BISSO TOWBOAT CO., Inc., v. ALABAMA & NEW ORLEANS TRANSP.
CO. et al.

ALABAMA & NEW ORLEANS TRANSP. CO. et al. v. JAHNCKE NAVIGA-
TION CO. et al.

(Circuit Court of Appeals, Fifth Circuit. March 15, 1921.)

Nos. 3562, 3599.

Towage ⬚⇒11(2)—Towing companies liable for negligent loss of tow.

A towing company, which contracted for towing, and a second company, which it employed to complete the towage when its own tug broke down, both *held* in fault for loss of the tow, consisting of three seaworthy barges with deck loads of clamshells, which capsized and sunk while being towed down the Mississippi at night, on evidence showing that, when the second tug came to take charge of the tow at night, the watchmen of the barges were absent, but that on instructions of the agent of the first company the tug made up the tow and proceeded without any one on board, and that the capsizing was due to the excessive speed of the tug, which caused the cargoes to shift, and the absence of watchmen on board, whose duty it would have been to report the fact and to keep the cargoes trimmed.

Appeals from the District Court of the United States for the Eastern District of Louisiana; Rufus E. Foster, Judge.

Suit by the Jahncke Navigation Company against the Alabama & New Orleans Transportation Company, the Alabama & New Orleans Canal Company and the Bisso Towboat Company, with cross-libel by the Bisso Towboat Company. Decree for libelants and respondents and cross-libelant appeal. Affirmed.

In No. 3562:

John D. Grace, of New Orleans, La., for appellant.

Henry P. Dart, Jr., George Denegre, Victor Leovy, and Henry H. Chaffe, all of New Orleans, La., for appellees.

In No. 3599:

George Denegre, Victor Leovy, and Henry H. Chaffe, all of New Orleans, La., for appellants.

Henry P. Dart, Jr., and John D. Grace, both of New Orleans, La., for appellees.

Before WALKER, BRYAN, and KING, Circuit Judges.

KING, Circuit Judge. These cases come before this court on two appeals from a decree rendered in a proceeding by libel in personam brought by the Jahncke Navigation Company, in the United States District Court for the Eastern District of Louisiana, against the Alabama & New Orleans Transportation Company (hereinafter styled Transportation Company), the Alabama & New Orleans Canal Company (styled the Canal Company), and the Bisso Towboat Company (styled the Towboat Company), to recover damages claimed to have been sustained by the capsizing of the barges Kansas, Illinois, and Amite, and the loss of their cargoes, in towing the same from the

mouth of the Lake Borgne Canal on the Mississippi river to Pointe-a-la-Hache located about 35 miles down the river.

The District Court found as follows:

"Libelant made a contract with the Transportation Company to tow a number of barges loaded with clamshells through the Lake Borgne Canal down to Pointe-a-la-Hache. It is admitted in the answer that the contract was for the benefit of the Canal Company. On March 23, 1913, libelant delivered said three barges loaded with clamshells at the lake end of the Lake Borgne Canal. They were taken through the canal by one of the tugs owned by the Transportation Company and moored in the Mississippi river near the mouth of the canal. Owing to the breaking down of the tug owned by the Transportation Company, that company employed the Towboat Company to complete the voyage with the barges. The Towboat Company sent their tug Independent to tow them to Pointe-a-la-Hache. There is no doubt the barges were staunch and seaworthy for the purposes for which they were intended. They were approximately 97 feet long by 28 feet beam. On the deck of the barges was erected a cargo bin for practically the entire length and width of the deck space. This bin rose about 4 feet above the deck line with a space all around on the bottom of about 3 inches intended to act as a scupper to allow any water shipped to be drained off. It is customary when encountering rough weather to close up these spaces with wooden battens. The barges were equipped with lines and pumps and connections for steam syphons. It is customary for each barge to be in charge of a watchman whose duty it is to keep the barge pumped out, nail on the battens in case of need, to prevent any listing of the barge by the shifting of the cargo or washing out of same, to keep the barge in trim, and to generally look out for the safety of the barge while towing. The tug Independent arrived at the river end of the Lake Borgne Canal at about 8:30 p. m. on the night of the trip from there to Pointe-a-la-Hache. There were only two watchmen employed on the fleet and these two men were absent at the time. They doubtless had reasons to believe that the trip would not start until the next morning and had absented themselves for proper purposes. Serpas, superintendent of the canal and the Transportation Company was on shore when the Independent arrived. He was hailed by Lamb, captain of the tug, and told him to proceed with the barges. Lamb advised him that there were no watchmen on the barges at the time, and Serpas told him to go ahead with them anyway as it was necessary for them to be promptly delivered. Lamb then went on board the barges, inspected them, found that there was no water in their holds, and that the hatches were properly closed and battened down, and that the barges were in good condition. There is some conflict in testimony as to the amount of cargo they each carried. The cargoes were entirely on deck. The evidence of a number of witnesses shows that the decks of the barges were about 6 inches out of the water amidships, the lowest point. Lamb and other witnesses testify that the decks of the barges amidships were about 6 inches under water, but it is also shown that even this condition would be safe under ordinary circumstances, and that it was not unusual to load barges and tow them in that condition across Lake Pontchartrain and Lake Borgne. I am inclined to think the preponderance of the evidence shows that the barges were loaded light and that the decks were in fact entirely out of the water, but this is comparatively immaterial. The tugboat then hooked up to the barges, towing them in tandem fashion with about 8 or 10 feet of space in between the stern of the preceding barge and the bow of the barge following. The crew of the tugboat made up the tow. When they had proceeded down the river some distance the two rear barges broke adrift. The tug did what it could to salvage them and rearrange the tow. Subsequently, however, all of the barges capsized, and the eventual result was that the cargo of each was entirely lost and all were badly damaged in the attempt to save them. The libel alleges that the loss was caused by the improper method of arranging the tow, and that the tug proceeded down the river at full speed after dark, which was negligent and not safe under the circumstances.

"I am convinced that the tug proceeded at a high rate of speed and that this was the primary cause of the accidents to the barges. The crew of the tug was undoubtedly in a hurry. They had been working all the preceding day around the harbor of New Orleans. The captain and mate had been on duty since 6 o'clock of the morning of that day, and, though the mate had had some sleep, apparently the captain had gotten little or no rest. Before leaving her moorings in the city of New Orleans the captain advised the crew that they would have to be back in the city by 6 o'clock the next morning. (See testimony of Grusich, p. 71.) This was manifestly impossible if the tow proceeded at slow speed. There was no food on board, and there was every incentive for the crew of the tug to make the trip as rapidly as possible. Lamb testifies that the tug was proceeding under a slow bell, but he had no idea as to what the rate of speed was, and it is evident from his entire testimony that the speed of the tow under a slow bell might vary according to the amount of steam pressure and the general running of the engines. There is some effort to show a gale of from 15 to 20 miles an hour was blowing when the tow reached the point where the accidents occurred, but it is doubtful to my mind that there was any unusual or unexpected weather sufficient to make the loss of the barges inevitable, and there is no question that the tug was competent to handle the fleet in any situation, if they had proceeded with due care.

"The fact that there were no watchmen on board was known to all the defendants before the voyage was started and it is clear that the danger of this was assumed by the Transportation Company. Serpas knew it and instructed Lamb to go ahead with the tow and under these circumstances the Transportation Company assumed the risk of the barges being without watchmen. It was the duty of the tug and the duty of the Transportation Company to see that the tow was in condition for towing before starting. The barges were seaworthy in every way, properly equipped except as to the watchmen. I believe that the absence of the watchmen contributed greatly to the subsequent loss of the barges. Had the watchmen been on board they could have trimmed the cargo and nailed down the battens or they could have notified the tug of the impending danger. Therefore, as between the defendants, the damages should be divided.

"There will be a decree in favor of libelant for the full amount of the damages suffered in solido as against the defendants and as between the defendants the damages to be equally divided, each to have judgment over against the other for one-half of the award, in the event of paying the whole judgment.

"The Bisso Tugboat Company has filed a cross-libel praying for compensation for extra services rendered in salvaging the barges. This demand will be rejected."

The case was referred to a commissioner to ascertain the amount of damages and he reported the amount of $5,537.35, with interest from the date of the decree fixing the liability, and a decree was entered against all of the defendants in solido, but divided the damages inter sese, one-half against the Towboat Company and one-half against the Transportation and Canal Companies.

The barges were proceeding apparently safely down the stream while being towed behind the tug. In his evidence the captain states that, the river being rough:

"I started out with them, thinking that that would be a better way to tow them on account of the swells in the river. You always tow barges according to the condition of the weather; but after this barge broke loose I decided to take them alongside. I thought I could care for them better alongside the tug * * * where they could be watched by the crew of the boat."

There is no evidence to indicate why they broke loose or that they could not have been taken in tow behind the tug again. After a very

careful review of the record we are unable to find any error in the findings of the District Court which would call for a reversal of its decree.

There is evidence from which it can be inferred that, after the time lost in picking up the barges which broke loose and rearranging the tow, the tug was proceeding at a greater speed than was prudent, in view of the change in this arrangement of the barges and the head wind coming up the river against the current. When brought alongside they were subjected to the wash of the water in a different way, the tug and barges being fastened abreast, and evidently the washing out of the shells was thus caused. The captain and crew knew that there were no watchmen on the barges. This called on them for the exercise of greater watchfulness. The barges traveled nearly 10 miles before any notice seems to have been taken of their listing and it appears that it was then too late to save them. They capsized very shortly after they were first noticed.

With the exercise of ordinary care in observing the effect of the change in the method of towing the barges, it would seem their listing should have been discovered in time to prevent their capsizing. After the Kansas and Amite capsized, several hours elapsed before the Illinois turned over, and nothing seems to have been done to prevent on her a like shifting of cargo which had capsized the other barges. On the whole we think the evidence warrants the finding that the respondents were at fault.

So far as the libelant is concerned, the Transportation and Canal Companies were equally liable with the Towboat Company for the proper towing of these barges, and as the act of the Transportation and Canal Companies in directing the Towboat Company to proceed on the trip without watchmen on the barges contributed substantially to the disaster, we think the District Court did not err in holding them ultimately responsible for one-half of the damages.

The costs on appeal in the two cases are ordered to be paid, one-half by Bisso Towboat Company and one-half by the Alabama & New Orleans Transportation Company and Alabama & New Orleans Canal Company.

The decree of the District Court is affirmed.